[Cite as *State v. Smith*, 2011-Ohio-3051.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 95243

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## DUANE SMITH

DEFENDANT-APPELLANT

---

## JUDGMENT:
## AFFIRMED IN PART AND VACATED
## IN PART

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-532637

**BEFORE:**   Sweeney, P.J., Rocco, J., and E. Gallagher, J.

**RELEASED AND JOURNALIZED:**     June 23, 2011

**ATTORNEY FOR APPELLANT**

Paul Mancino, Jr., Esq.
75 Public Square, Suite 1016
Cleveland, Ohio 44113-2098

**ATTORNEYS FOR APPELLEE**

William D. Mason, Esq.
Cuyahoga County Prosecutor
By: Vincent I. Pacetti, Esq.
      Andrew J. Santoli, Esq.
Asst. County Prosecutors
Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

JAMES J. SWEENEY, P.J.:

{¶ 1} Defendant-appellant, Duane Smith, was charged in a twenty-two count indictment for an incident that occurred during a residential poker game on October 26, 2009. Following a bench trial, defendant was found guilty of multiple offenses relating to each victim, including aggravated burglary, aggravated robbery, kidnapping, theft, having weapons while under disability, and various specifications. For the reasons that follow, we vacate defendant's convictions on the repeat violent offenders specifications and affirm his convictions and sentence in all other respects.

{¶ 2} Thomas Gross testified that he attended a poker game at Matt Shultz's Lake Road residence in Cuyahoga County, Ohio on October 26, 2009. Also present were five other men identified as: Charlie, Chris, Simon, Khai, and Jonathan Powell. He had played poker with Powell before. That evening, Gross observed Powell spending a lot of time on his cell phone, sending text messages. Gross also noticed that Powell had exited and returned to the apartment about four or five times that night.

{¶ 3} Gross had purchased approximately $200.00 worth of poker chips and was "up about 300" in the game. After Powell went out to smoke, there was a knock on the apartment door. Chris answered it, and Powell was thrown into the apartment and followed by two African American men with guns. One entered and ordered the men to take off their pants, which were placed into garbage bags. That man was shorter and stockier than the other who remained in the doorway. Gross did not get a good look at the men and could not identify them. Gross attempted to throw his cell phone, keys, and money underneath a nearby desk. At that point, the gunman stuck a gun in his face and Gross noticed he had a beard. The gun appeared to be a semiautomatic, machine gun that closely resembled a Mack 10. Gross was familiar with guns and believed the weapon was a real firearm. After gathering the victims' belongings, the gunman ushered the men into the 4'9" wide kitchen area where he sprayed them with pepper spray. The gunmen left and, within ten minutes, the victims called the police on a cell phone. Gross was suspicious of Powell but did not initially mention this to the police. Gross testified that

the men stole just under $2,000.00 in cash from him along with his iPhone, his car keys, and his pants, belt, and wallet.

{¶ 4} Matthew Shultz testified that he hosted a poker game in his efficiency apartment on the night of October 26, 2009. He operated as the bank whereby he would exchange the players' money for chips and hold the money in his front pocket. He was wearing khaki pants and a red button-up shirt that night. The players that night were Tom Gross, Khai, Charlie, Chris, Simon, and Jonathan Powell. He met Powell about three years prior when they played in games at Nautica. Powell had attended other poker games at Shultz's house before October 26, 2009. Shultz said Powell was acting out of character that night and was not playing in his typical fashion. Powell was also texting on his phone the whole time and took several smoking breaks. Shultz described Powell as disengaged and drinking several beers. The last time Powell left, he was gone for thirty minutes and, when he returned, the men were robbed.

{¶ 5} There was a knock on the door, Chris opened it and Powell came "flying in the door, like someone pushed him," and two other people with a machine gun were behind him. The first man went right to Shultz and demanded the money, which he gave him. The men ordered the poker players to get on the floor, take off their pants and empty their pockets. The man held the gun to Shultz's head. The man had a hood on but Shultz said he got a good look at his face. Shultz made an in-court identification of defendant as the man who robbed him at gunpoint. He was one hundred percent certain.

**{¶ 6}** Shultz complied with the orders of the gunmen. The other man stayed mostly in the doorway. They collected cell phones, clothes, and money. Then, they took the poker players into the kitchen one by one and sprayed them with an orange substance. He heard a foot pattern and his door close. They waited about 30 seconds and the victims dispersed from the kitchen and called police.

**{¶ 7}** Shultz recalled looking around the room during the robbery and noticed Powell acting odd; he was the only one that was excessively convulsing and crying. Everyone else was calm and doing what they were told. Shultz felt Powell's reaction looked fake. Shultz did not get a good look at the second gunman, except to notice that he was taller, slender, and had a handgun. Police arrived within thirty minutes and, at that time, Shultz related his suspicions about Powell.

**{¶ 8}** Det. Lynch contacted Shultz a few days later and obtained his statement. Shultz provided Det. Lynch with two phone numbers for Powell. Shultz was shown two photo arrays and identified defendant as the man who held him at gunpoint. Shultz was one hundred percent certain of this identification. However, Shultz was unable to identify anyone from the second photo array, which included a photograph of Stanley Smith, the other alleged gunman. Shultz remained in close contact with Det. Lynch throughout the course of the investigation.

**{¶ 9}** Chris Foertch testified that he was also present at the October 26, 2009 poker game at Shultz's residence. He opened the door when Powell was shoved inside by two

men. Foertch was unable to identify either of the assailants. His testimony was similar to the other eyewitness, indicating the men were told to get on the floor, take off their pants, which were collected in trash bags. The men were placed in the kitchen and sprayed with mace. Foertch lost between $600.00 to $800.00 that night.

{¶ 10} Charlie Ha was present at the October 26, 2009 Shultz's poker game. He indicated that he had previously been robbed at a poker game in Solon and was, for that reason, concerned for his safety. Ha asked Shultz to identify people before buzzing them into the apartment. Ha stated that Shultz also removed his address from the public website for safety purposes; which made the game's location known only to the players. Ha was unable to identify the two robbers that followed Powell into the apartment. Ha brought approximately $1200.00 to the game, which was stolen.

{¶ 11} Reba Smith was charged as a co-defendant in this case and is defendant's cousin. She testified that defendant participated in the October 26, 2009 robbery at Shultz's apartment, along with Powell and another cousin, Stanley Smith. Powell and Reba had dated in the past. Reba maintained that Powell had asked her to help him get a television from the westside of Cleveland. She drove Powell's SUV and he entered the apartment. Later, her cousins, Stanley and defendant, pulled into the parking lot in a white car. At this point, they spoke with Powell and then both got into the SUV. She claims this is when she found out that the men planned to rob people inside the apartment. She waited inside the car and exchanged text messages with Powell who identified the

man in the red shirt as the person with the money. Eventually, Powell sent a text telling her to send defendant and Stanley inside. She saw them go inside and come out with garbage bags shortly after. Reba did not see any weapons during the entire incident. They drove back to Stanley's "baby mama's" house and Powell met them there later. Reba believed that defendant threw out one of the garbage bags on their way home. The men divided up the money and she received $200.00. Reba testified that she did discuss the incident with her family. Police arrested her on December 23, 2009 and she cooperated with police, gave a statement, and pled guilty to some of the charges against her. As part of her plea agreement, Reba had to testify against defendant in this case.

{¶ 12} Powell testified that he met defendant and Stanley Smith through his ex-girlfriend Reba Smith. Although Reba and Powell were no longer dating on October 26, 2009, he continued to remain friends with her. Powell said that on the "spur of the moment" plans were made to rob a poker game he was attending on the night of October 26, 2009. According to him, Reba knew about the robbery plan all along. He said Reba drove defendant and Stanley Smith in his SUV to the westside, while he drove separately in Reba's white car. They used two cars because they needed a getaway vehicle. He went inside as they waited in the parking lot watching movies in his SUV until he told them to come inside. Powell confirmed that he took several smoking breaks during the course of the evening. Reba kept sending him text messages urging him to hurry up because she had to pick up her son. Powell went outside and they decided defendant and Stanley would

follow him inside. Defendant and Stanley had guns, which he claimed they brought. Powell's shirt was ripped to make it look like he had been roughed up. He knocked on the door and when Chris opened it, he was thrown inside. He tried to make it look like he was not involved and mostly kept his head down. They had trash bags to collect everyone's pants, cell phones, keys, and money. Powell was surprised when they sprayed them with mace because he was not aware of this part of the plan. Powell said he gave a brief statement to police and did not think anyone suspected him. He became concerned when Shultz called police and the story was aired by the media. There was also a concern that defendant had told his girlfriend about the robbery and that she was threatening to call Crime Stoppers, which is documented by text messages exchanged between Reba and Powell. When Reba was arrested, she called Powell who was reluctant to discuss it with her for fear she was working with police to apprehend him. Eventually, Powell turned himself in, pled guilty to certain charges, and provided a statement to police. Powell's plea agreement also required him to testify against defendant.

{¶ 13} Det. Lynch was assigned to investigate this case on October 27, 2009. He remained in close contact with Shultz, who provided him with Powell's cell phone numbers. Det. Lynch subpoenaed the phone records and received a series of documents reflecting text messages sent by Powell's phones during the time in question. Both Powell and Reba confirmed the accuracy of the text messages sent between them that are reflected in those records. Lynch issued arrest warrants for Reba and Powell and arrested

Reba in December of 2009. She indicated that defendant and Stanley Smith participated in the robbery, which lead to arrest warrants being issued for them. Det. Lynch interviewed defendant in January of 2010 and advised defendant of his constitutional rights. First, defendant denied any involvement but after he was advised that Shultz had identified him, defendant changed his statement. Det. Lynch testified that defendant instructed him not to record his statement in any way. Defendant also refused to implicate his cousin and referred to the other individual as "Dude." According to Det. Lynch, defendant admitted that he participated in the robbery along with Reba and Powell. The only difference between defendant's version and Powell's version was that defendant claimed that Powell had supplied the guns. Later, Det. Lynch recorded notes of defendant's statement on a Scene Magazine while he was having dinner. The next day, Lynch used the notes to prepare his supplemental report.

{¶ 14} Det. Lynch confirmed that he was present for the entire trial and that the evidence was inconsistent with respect to the amount of money involved. He also indicated that he was unable to follow up with one of the victims, Khai.

{¶ 15} Although identified as victims in multiple counts of the indictment, Khai and Simon did not testify at defendant's trial.

{¶ 16} The trial court granted defendant's motion for acquittal in part and dismissed counts 4, 5, 10, 11, 16, and 17.

**{¶ 17}** The defense presented the testimony of defendant's grandmother, his mother, and himself. Defendant's grandmother testified that Reba came to her house to discuss the incident. Defendant's mother said that defendant was with her at home by 9:00 p.m. on October 26, 2009 and was there when she woke up around 11:00 a.m. the next day. However, she said she fell asleep watching wrestling and did not know what defendant was doing while she was asleep.

**{¶ 18}** Defendant testified that he went with Reba to the westside apartment complex the evening of October 26, 2009. He said that she wanted him to help her get a television. According to defendant, they waited in the parking lot for Powell but then defendant had Reba drive him home around 9:00 p.m. Defendant insisted that he left the location three hours before the robbery occurred. It was defendant's testimony that Reba was lying because she was in love with, and afraid of, Powell. Defendant believes that Powell was also lying and implicated him in the robbery because there was a dispute between them as a result of defendant's cousin, Alecia, taking Powell's money in an unrelated incident. Defendant also testified that Det. Lynch was lying and had fabricated evidence. Specifically, defendant denied making any statement or admissions to Det. Lynch.

**{¶ 19}** The court found defendant guilty of all remaining charges and specifications and merged the allied offenses of similar import. The State elected to pursue sentencing on counts 1, 2, 3, 6, 7, and 20 for which the court imposed an aggregate sentence of eighteen years. Defendant appeals assigning multiple errors for our review, which will be discussed together where appropriate for ease of discussion.

{¶ 20} Also, because this matter proceeded to a bench trial, with respect to each assignment of error we must presume that the trial judge disregarded any improper testimony. *Columbus v. Guthmann* (1963), 175 Ohio St. 282, 194 N.E.2d 143, paragraph three of the syllabus.

{¶ 21} "I. Defendant was denied due process of law and fair trial when the court permitted Det. Thomas Lynch to testify as to the truth and veracity of witnesses."

{¶ 22} Defendant relies on case law that holds it is improper for a witness to vouch for the credibility of another witness. *State v. Young*, Cuyahoga App. No. 79243, 2002-Ohio-2744 (holding that it was plain error when a detective testified that a witness was "telling the truth.")

{¶ 23} Defendant believes the following testimony from Det. Lynch attests to the truth of what Powell had told him and invaded the province of the jury:

{¶ 24} "Q. Okay. Did you later get a statement from Jonathan Powell?

{¶ 25} "A. Yes. About two weeks ago on May the 5th I took an audio statement from Mr. Powell.

{¶ 26} "Q. And in regard in that statement, what did Mr. Powell tell you about the robbery?

{¶ 27} "A. Mr. Powell basically told me the same thing that Duane Smith told me with the only difference being that he didn't set the robbery up. It was kind of an agreed thing. Interviewing Mr. Smith he told me that Mr. Powell had furnished them with the

weapons. Mr. Powell said that was absolutely not true, that they had the weapons. He didn't know much about guns but he basically corroborated what Duane Smith had already told me."

{¶ 28} Defendant did not object to this testimony and, therefore, has waived all but plain error.

{¶ 29} Det. Lynch did not vouch for the credibility of any witness. He testified that two people provided similar statements to him. To say that one statement corroborated another is not to say that either was true but rather that one agreed with the other, that they were consistent. Det. Lynch did not testify that either Powell or defendant was telling the truth; nor did he give his opinion as to the veracity of their respective statements. Defendant's testimony in which he denied making any statement to Det. Lynch created a conflict in the evidence, that being between the credibility of Det. Lynch's testimony versus defendant's testimony concerning his alleged statement, or lack thereof. Resolving the conflict among the witnesses' testimony was a matter appropriately left to the trier of fact. This assignment of error is overruled.

{¶ 30} "II. Defendant was denied his right to present a defense."

{¶ 31} Defendant complains that he was not able to thoroughly examine the potential bias of Powell with respect to an alleged dispute he had with defendant's family. Defendant also maintains that he was improperly prohibited from eliciting testimony from his grandmother about what Reba allegedly told her. Finally, defendant believes that he

was unable to fully elaborate on the details of Powell's alleged dispute with his cousin, Alecia Smith. Defendant argues that these instances precluded him from presenting evidence of Powell's alleged bias and prejudice against him.

{¶ 32} In the bench trial, evidence was elicited that alleged defendant's cousin, Alecia Smith, had taken money from Powell, that Powell was upset and that defendant became involved in resolving the dispute. Several witnesses, including defendant, testified about the details of this incident. In fact, defendant went into great detail about this episode. Eventually, the trial court requested defense counsel to re-direct the testimony to the events of October 26, 2009. At that point, defense counsel explained that the purpose of the testimony surrounding the Alecia Smith incident was to illustrate "why Powell would say [defendant] was one of his accomplices. He had a motive to lie." The trial court indicated that the defense had established there was a dispute and the court understood the nature of the dispute. With that, the defense agreed to move on to other testimony. The trial court did not abuse its discretion concerning the admission of evidence of Powell's potential bias or prejudice concerning the Alecia Smith incident; nor was defendant denied an opportunity to present a defense with regard to it.

{¶ 33} The trial court precluded the defense from questioning Jean Smith about the contents of a conversation she allegedly had with Reba. The defense argued that the testimony was admissible to impeach Reba who they believed had testified she did not discuss the incident with her grandmother, Jean Smith. Reba's testimony is somewhat

unclear as to whether she had discussions about the case with her grandmother, Jean Smith. Assuming Reba did deny having a conversation with Jean Smith, the trial court allowed the defense to elicit testimony from Jean Smith that Reba did, which served the purpose of impeaching any statement made by Reba to the contrary. While defendant contends that the trial court erred by excluding the contents of the conversation in that it was allegedly probative of Reba's truthfulness, we cannot say the trial court erred by excluding it because that portion of Jean Smith's testimony is not a part of, or otherwise described, in the record.

**{¶ 34}** This assignment of error is overruled.

**{¶ 35}** "III. Defendant was denied effective assistance of counsel."

**{¶ 36}** To establish his claim of ineffective assistance of counsel, defendant must show that (1) the performance of defense counsel was seriously flawed and deficient; and (2) the result of appellant's trial or legal proceeding would have been different had defense counsel provided proper representation. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Brooks* (1986), 25 Ohio St.3d 144, 495 N.E.2d 407.

**{¶ 37}** Defendant premises his ineffective assistance of counsel claim on the following: (1) a motion to suppress identification was not filed; (2) a motion to suppress oral statements was not filed; (3) counsel did not request a continuance due to late discovery; (4) counsel did not attempt to exclude evidence of defendant's prior

convictions; and (5) counsel was allegedly not prepared for trial. For the reasons discussed below, the record does not support defendant's allegations of ineffective assistance of counsel.

{¶ 38} Failing to file a motion to suppress does not constitute ineffective assistance of counsel, per se. *State v. Drummond,* 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶208; see, also, *State v. Weatherspoon*, Cuyahoga App. No. 89996, 2008-Ohio-2345; *State v. Hamilton*, Cuyahoga App. No. 90141, 2008-Ohio-455. Rather, to establish ineffective assistance of counsel for failure to file a motion to suppress, a defendant must prove that there was a basis to suppress the evidence in question. *Weatherspoon*, supra.

{¶ 39} Defendant contends a motion to suppress was warranted because he believes there was an issue as to whether defendant had been properly advised of his constitutional rights before he made the oral statements. However, Det. Lynch clearly testified as follows, "I told him why I was there, *advised him of his Constitutional Rights*, which he stated he understood and asked him if he wanted to speak to me regarding this incident." (Emphasis added.) There is no indication in the record that defendant was not properly advised of his rights. Further, defendant testified that he did not make any oral statements to Det. Lynch and that essentially Det. Lynch had fabricated that part of his testimony. Whether or not the oral statements were made is a matter of factual credibility but it does not serve as a basis for suppressing the statement. To the extent defendant complains that

Det. Lynch did not record his statement, Det. Lynch testified that he did not do so because defendant would not allow it. It was not ineffective assistance of counsel to not pursue a motion to suppress defendant's statements. In a related attack on his counsel's performance, defendant asserts his counsel was deficient for not seeking a continuance due to the late production of Det. Lynch's handwritten notes.

{¶ 40} According to Det. Lynch, defendant did not allow him to take contemporaneous notes, which is why he wrote them down later on a Scene Magazine during his dinner-lunch break. Det. Lynch then put his notes into a supplemental report that was provided to the defense prior to trial. The handwritten notes were used by the State in rebuttal to address defendant's testimony that alleged Det. Lynch fabricated the oral statement. They were not used during the detective's direct examination and the State indicated it had not intended to use the notes at trial. Nonetheless, Crim.R. 16(B)(1) requires that "[u]pon receipt of a written demand for discovery by the defendant, and except as provided in division (C), (D), (E), (F), or (J) of this rule, the prosecuting attorney shall provide copies or photographs, or permit counsel for the defendant to copy or photograph, the following items related to the particular case indictment, information, or complaint, and which are material to the preparation of a defense, or are intended for use by the prosecuting attorney as evidence at the trial, or were obtained from or belong to the defendant, within the possession of, or reasonably available to the state, subject to the provisions of this rule:

{¶ 41} "(1) Any written or recorded statement by the defendant or a co-defendant, including police summaries of such statements, and including grand jury testimony by either the defendant or co-defendant * * *."

{¶ 42} Det. Lynch's obvious purpose in making the notations on the Scene Magazine was to record defendant's statement and, therefore, to the extent the notes were reasonably available to the state, they should have been provided to the defense prior to trial. However, from the record we glean that the notes were incorporated into Det. Lynch's supplemental report that was provided to the defense prior to trial and defendant does not contend there are any inconsistencies between them. The court specifically inquired as to whether the defense had the information prior to trial, which defense counsel confirmed receipt of it approximately one week before trial. The defense was aware of the alleged statement before trial. The notes produced during trial were offered to rebut defendant's accusations that Det. Lynch had lied about the oral statement by corroborating Det. Lynch's prior testimony with notes he made on a periodical bearing the date of the alleged statement. There is no indication of any inconsistencies between the notes and the report that incorporated them. To the extent a discovery violation occurred, the court did inquire into the circumstances and there was no reason to delay the bench trial with a continuance in this case.

{¶ 43} With respect to the admission of Shultz's pretrial identification of defendant as a gunman, counsel was not ineffective when he did not pursue a motion to suppress it.

First, defendant's reliance to the procedures set forth in R.C. 2933.83 is misplaced as those provisions were not in effect when the police presented Shultz with the photo array.

**{¶ 44}** A court is not required to suppress an identification of a suspect unless the confrontation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under all the circumstances. *In re Henderson*, Cuyahoga App. No. 79716, 2002-Ohio-483. Even if the pretrial identification procedure was impermissibly suggestive, an in-court identification is permissible if the State establishes by clear and convincing evidence that the witness had a reliable, independent basis for the identification based on prior independent observations made at the scene of the crime. *State v. Tate*, Cuyahoga App. No. 81577, 2003-Ohio-1835, citing *In re Henderson*, Cuyahoga App. No. 79716, 2002-Ohio-483. No due process violation will be found where an identification does not stem from an impermissibly suggestive confrontation but is instead the result of observations at the time of the crime. Id. In determining whether an identification is reliable, a court must consider (1) the witness's opportunity to view the suspect at the time of the incident, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description, (4) the witness's certainty when identifying the suspect at the time of the confrontation, and (5) the length of time elapsed between the crime and the identification. *State v. Waddy* (1992), 63 Ohio St.3d 424, 439, 588 N.E.2d 819.

**{¶ 45}** In this case, Shultz was positive of his identification of defendant as the person who held a gun to him. He saw his face and was certain. According to the

record, the detective told him to look at an array which may or may not include the suspect. Similarly, the detective presented Shultz with a second array that contained a photo of co-defendant Stanley Smith, who was the alleged accomplice that stood in the doorway and whom Shultz said he did not see as clearly. From these two arrays, Shultz only identified defendant. He did not identify anyone from the second array.

{¶ 46} The cases that defendant relies on are distinguishable from the facts here with respect to the victim's ability to view the suspect. In this case, Shultz testified that defendant stood over him with a gun in his apartment where a poker game had been in progress. He had an unobstructed view, saw the gunman's face, and was positive of his identification. The fact that defendant does not match the height and weight description supplied by Shultz was explained. Shultz stated that he could not be sure of the height due to his position on the floor.

{¶ 47} There appears nothing "unduly suggestive" about defendant's photograph. Defendant's photo does not stand out from the other photos that are contained in the array that all have similar facial characteristics. The differences among the photographs in the subject array are minor and do not make one photograph more suggestive than any of the other photographs. There is no reason to conclude that the victim identified defendant's photo due to such subtleties. Shultz's testimony illustrates his ample opportunity to view the suspect and he did not waiver in his certainty. The reliability of Shultz's identification is further buttressed by the fact that Shultz did not identify the co-defendant who appeared

in a contemporaneous array. Based on this record, defendant's trial counsel was not ineffective in failing to file a motion to suppress the pretrial identification of defendant. Accordingly, defendant was not denied effective assistance of counsel on this basis.

{¶ 48} Defendant also maintains that his prior convictions were admitted in error. Defendant stipulated to his prior felony conviction in 1996. When defendant took the stand, he stated he was on probation for a "misdemeanor." Defendant has failed to establish that the admission of either conviction amounted to ineffective assistance of counsel. He has not established a reasonable probability that the outcome of the trial would have been any different if the evidence of his convictions were excluded.

{¶ 49} Evid.R. 609(B) provides:

{¶ 50} "Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction *or of the release of the witness from the confinement*, or the termination of community control sanctions, post-release control, or probation, shock probation, parole, or shock parole imposed for that conviction, *whichever is the later date*, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than ten years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such

evidence to provide the adverse party with a fair opportunity to contest the use of such evidence." (Emphasis added.)

{¶ 51} Defendant testified that he served seven years for his 1996 felony conviction resulting in a release date sometime in 2003. Accordingly, his conviction was not inadmissible in this bench trial that took place in 2011. Evid.R. 609(B); see, also, *State v. Carter*, Cuyahoga App. No. 84816, 2005-Ohio-2179. Moreover, convictions over ten years are still admissible under certain circumstances. Id. Defendant, therefore, has not established ineffective assistance of counsel based on his attorney's decision not to object to the admission of his 1996 conviction.

{¶ 52} The judge who placed defendant on community control for his misdemeanor offense, was the same judge that conducted the bench trial and is presumed to have disregarded any improper evidence. *Guthmann*, 175 Ohio St. 282, paragraph three of the syllabus.

{¶ 53} Defendant's final basis in support of this assigned error, is that his attorney was not prepared for trial. Here, defendant reiterates the foregoing alleged deficiencies and adds: (a) that his attorney failed to call Gary Larkins as a witness; (b) that his attorney did not visit him enough in jail; and (c) should have obtained an expert on identification. Although defendant claimed he was with Gary Larkins rather than speaking with defendant in the afternoon prior to the robbery, there is no evidence in the record that Gary Larkins would have corroborated defendant's story. Secondly, defense counsel stated that

he did visit defendant in jail. Finally, this court has found that trial counsel is not ineffective when he or she chooses not to pursue the appointment of an expert witness on identification. *State v. Witherspoon*, Cuyahoga App. No. 94475, 2011-Ohio-704, ¶ 40-41, quoting, *State v. Hayes*, Cuyahoga App. No. 93785, 2010-Ohio-5234. Here, we do not find that trial counsel's performance was deficient in this regard particularly considering Shultz's certainty in his identification and the fact that this matter was tried to the bench rather than a jury.

{¶ 54} The third assignment of error is overruled.

{¶ 55} "IV. Defendant was denied due process of law when he was disproportionately sentenced to an eighteen (18) year sentence when a co-defendant, Stanley Smith, after a trial was sentenced to ten (10) years for more convictions."

{¶ 56} "V. Defendant was subjected to unconstitutional multiple convictions when the court acknowledged that various counts would merge."

{¶ 57} "VI. Defendant was denied due process of law when the court relied on its own personal knowledge at sentencing."

{¶ 58} "VII. Defendant was denied due process of law when he was sentenced to a consecutive sentence without any findings."

{¶ 59} "VIII. Defendant was subjected to unconstitutional multiple punishments when the court failed to merge the various aggravated robbery counts of the indictment."

{¶ 60} "IX. Defendant was subjected to unconstitutional multiple punishments when he was convicted and sentenced for aggravated burglary and aggravated robbery."

{¶ 61} All of these assigned errors challenge defendant's convictions and sentence and will be addressed together.

{¶ 62} The Ohio Supreme Court set forth the standard for reviewing felony sentencing in *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124. See, also, *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470. Appellate courts must apply a two-step approach when analyzing alleged error in a trial court's sentencing. "First, they must examine the sentencing court's compliance with all applicable rules and statutes in imposing the sentence to determine whether the sentence is clearly and convincingly contrary to law. If this first prong is satisfied, the trial court's decision shall be reviewed under an abuse-of-discretion standard." Id. at ¶ 4.

{¶ 63} Following briefing, this case was remanded to the trial court to correct the sentencing entry. On remand, the trial court complied and by journal entry dated February 4, 2011, indicated that defendant had been found guilty of aggravated burglary with firearm specifications, notice of prior conviction, repeat violent offender specification as charged in count 1; guilty of aggravated robbery with the same specifications as charged in counts 2, 3, 6, and 7; guilty of kidnapping with the same specifications as charged in counts 8, 9, 12, and 13; guilty of theft, aggravated theft as charged in counts 14, 15, 18, and 19; and guilty of having weapons while under disability as charged in count 20.

Defendant was acquitted of counts 4, 5, 10, 11, 16, and 17. The State elected to pursue sentencing on counts 1, 2, 3, 6, 7 and 20 and all other convictions were found to be allied offenses of similar import and merged as follows: counts 8 and 14 merged with count 2; counts 9 and 15 merged with count 3; counts 12 and 18 merged with count 6; counts 13 and 19 merged with count 7. The court imposed a single three year term for the firearm specifications that were all merged for sentencing purposes, which was to run prior to and consecutive to ten years on the base charge in each of counts 1, 2, 3, 6, and 7, all of which run concurrently to each other. Defendant also received a consecutive five year prison term for count 20. In total, defendant received an eighteen year sentence. The trial court did not impose any enhanced penalty despite the finding of guilt on the repeat violent specifications.

{¶ 64} Defendant's eighteen year sentence is within the statutory range and is not contrary to law.

{¶ 65} We now analyze the court's findings and review the decision for an abuse of discretion under the second prong of *Kalish*.

{¶ 66} A felony sentence should be proportionate to the severity of the offense committed, so as not to "shock the sense of justice in the community." *State v. Chaffin* (1972), 30 Ohio St.2d 13, 17, 282 N.E.2d 46. See, also, R.C. 2929.11(B). A defendant alleging disproportionality in felony sentencing has the burden of producing evidence to "indicate that his sentence is directly disproportionate to sentences given to other offenders

with similar records who have committed these offenses * * *." *State v. Breeden*, Cuyahoga App. No. 84663, 2005-Ohio-510, ¶81.

**{¶ 67}** Defendant contends that his sentence was disproportionate and inconsistent with the sentences imposed on the co-defendants. The applicable analysis in assessing the proportionality of a sentence is whether the sentence imposed is "consistent with sentences imposed for similar crimes committed by *similar offenders*." R.C. 2929.11(B) (emphasis added). In *State v. Berlingeri,* this court addressed a similar proportionality argument alleging inconsistency of sentences imposed among co-defendants and noted:

**{¶ 68}** "There is no requirement that co-defendants receive equal sentences. *State v. Wickham*, 5th Dist. No. CT2006-0084, 2007-Ohio-1754, ¶29, citing *State v. Lloyd*, 11th Dist. No. 2002-L-069, 2003-Ohio-6417, ¶21 and *United States v. Frye* (C.A.6, 1987), 831 F.2d 664, 667. 'Each defendant is different and nothing prohibits a trial court from imposing two different sentences upon individuals convicted of similar crimes.' *Wickham* at ¶29, citing *State v. Aguirre*, 4th Dist. No. 03CA5, 2003-Ohio-4909, at ¶50. When that happens, 'the task of the appellate court is to determine whether the sentence is so unusual as to be outside the mainstream of local judicial practice. We bear in mind that although offenses may be similar, there may be distinguishing factors that justify dissimilar sentences.' *State v. Beasley*, 8th Dist. No. 82884, 2004-Ohio-988, ¶24 (internal citation omitted)."

{¶ 69} The difference among the sentence defendant received for his convictions as opposed to that imposed upon co-defendants Reba Smith and Powell are justified by the fact that those individuals pled guilty to fewer offenses, admitted to their involvement, and cooperated with the authorities. Further, defendant does not contend that any of the co-defendants have a criminal record that is comparable to his own record.

{¶ 70} Instead, defendant contends that his sentence is disproportionate to the one received by his co-defendant Stanley Smith for the sole reason that Stanley was convicted of more offenses in this case but received a shorter sentence. Defendant does not provide any similarities shared by these individuals such as whether or not Stanley was also on probation at the time of this offense. The court considered defendant's conduct, including his involvement in another aggravated robbery incident and his juvenile record before it imposed the sentence. Although defendant received ten years on the base counts of aggravated robbery, the sentences are concurrent and therefore defendant did not receive the maximum, consecutive sentence that was permissible under the law. The court explained its rationale for the sentence that was imposed. Also, in reviewing the record, defendant's involvement in the offense was more extensive as compared to Stanley. For example, all of the witnesses said defendant entered the apartment, ordered the victims to floor and held a gun to Shultz and he was also accused of pepper spraying the men in the kitchen; while at the same time, the other gunman (presumably Stanley Smith) stood in the doorway. Defendant has not established that the trial court abused its discretion by

imposing a greater sentence on him than the other co-defendants. Assignment of error IV is overruled.

{¶ 71} Defendant also maintains that he was denied due process because the trial court did not make the statutory findings set forth in R.C. 2929.14(E)(4) and R.C. 2929.41(A), which were excised by *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470. In support of his argument, defendant contends that the United States Supreme Court's decision in *Oregon v. Ice* (2009), 555 U.S. 160, 129 S.Ct. 711, 172 L.Ed.2d 517, revived those portions of the statute and the trial court's obligation to comply with them prior to imposing consecutive sentences. The Ohio Supreme Court has rejected this argument in *State v. Hodge*, 128 Ohio St.3d 311, 2010-Ohio-6320, 941 N.E.2d 768, paragraphs one, two, and three of the syllabus (holding that trial court judges are not obligated to engage in judicial factfinding prior to imposing consecutive sentences unless the General Assembly enacts new legislation that requires it.) Assignment of error VII is overruled.

{¶ 72} We do not find that the court abused its discretion by declining to order a presentence investigation report or considering the fact that defendant was on probation to the court. The trial court is not obligated to order a pre-sentence investigation report prior to imposing a prison term. R.C. 2951.03. Defendant has not established that he was denied a fair sentencing hearing and assignment of error VI is overruled.

{¶ 73} Next we address defendant's contention that he was improperly convicted of multiple offenses. As set forth at the sentencing hearing and in the court journal entries, the court determined that count 1 was not an allied offense nor was count 20. As for the remaining counts, the State elected to pursue sentencing on counts 2, 3, 6, and 7; for which the trial court imposed sentences. All other convictions were merged as set forth above.

{¶ 74} In *Johnson*, the Ohio Supreme Court established the proper analysis for determining whether offenses qualify as allied offenses subject to merger pursuant to R.C. 2941.25.

{¶ 75} "In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other. * * * If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.

{¶ 76} "'If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind." *Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, at ¶50 (Lanzinger, J., dissenting).

{¶ 77} "If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.

{¶ 78} "Conversely, if the court determines that the commission of one offense will never result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge." Id. at ¶48-51.

{¶ 79} Because defendant's robbery convictions represent offenses he separately committed against multiple victims, they are not allied offenses of similar import. *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314. This is not similar to a fact pattern where an individual fires a gun into a crowd of people, which arguably could create allied offenses of similar import in the event the offender is charged with multiple counts of felonious assault for each victim. See *State v. Sutton,* Cuyahoga App. No. 90172, 2011-Ohio-2249. The evidence presented in this trial established that defendant took property from each identified victim by a threat of force and, therefore, acted with a separate animus with respect to each victim. Accordingly, assignments of error V and VIII are overruled.

{¶ 80} Defendant also contends that his convictions for aggravated burglary and aggravated robbery are allied offenses that should have been merged. Defendant argues that the convictions stemmed from a single event. However, once defendant entered the apartment with an intent to commit a felony inside, the crime of burglary was complete. When he proceeded to take property from the various individuals inside, while brandishing a gun, he engaged in separate crimes of robbery. For that reason, these are not allied

offenses of similar import and the court did not err by imposing separate sentences for them. See *State v. ONeil*, Portage App. No. 2010-P-0041, 2011-Ohio-2202, ¶46-47, quoting, *State v. Frazier* (1979), 58 Ohio St.2d 253, 389 N.E.2d 1118; see, also, *State v. Slagle* (1992), 65 Ohio St.3d 597, 611 ("aggravated robbery and aggravated burglary are not allied offenses of similar import where, as here, the offenses are committed separately * * *.") Assignment of error IX is overruled.

{¶ 81} "X. Defendant was denied due process of law when the court found defendant guilty of a repeat violent offender specification."

{¶ 82} Defendant was charged with repeat violent offender specifications on several counts pursuant to R.C. 2941.149(A). R.C. 2929.01(C)(C) sets forth the definition of a repeat violent offender, and includes a prior conviction for an attempted felony offense of violence if the attempted offense is of the first or second degree.

{¶ 83} One who is found guilty of an RVO specification is subject to an enhanced penalty beyond the maximum term provided for the base charge. In other words, a RVO specification in this case subjected defendant to potential additional prison time of up to another ten years beyond the ten years imposed for base offense, such as aggravated robbery. R.C. 2929.14(D)(2)(a)(I).

{¶ 84} The parties stipulated to journal entries identified as State's Exhibits 1 and 2, which represent a plea journal entry and a sentencing journal entry from defendant's 1996 conviction. However, there is a clear discrepancy on the face of the exhibits. The plea

journal entry reflects that defendant entered a guilty plea to a lesser included offense of robbery with violence specifications, which was a felony of the second degree. The sentencing journal entry, however, indicates that defendant had entered a plea to attempted robbery, which would have constituted a felony of the third degree. If defendant was convicted of robbery, the evidence would establish the repeat violent offender specification as defined by R.C. 2929.01(C)(C), but if he was convicted of attempted robbery it would not. Any error in finding defendant guilty of the RVO specifications was harmless because the trial court chose not to impose any enhanced penalty for them.

{¶ 85} Nonetheless, the State bears the burden of proving the specifications and, as a result of the conflicting journal entries, the evidence in the record did not prove that defendant had a prior conviction that would satisfy the RVO specification. The tenth assignment of error is sustained to the extent that we vacate the trial court's finding of guilt as to the repeat violent offender specifications only but affirm defendant's convictions and sentence in all other respects.

It is ordered that appellee and appellant split the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the

Rules of Appellate Procedure.

_____

JAMES J. SWEENEY, PRESIDING JUDGE

KENNETH A. ROCCO, J., and
EILEEN A. GALLAGHER, J., CONCUR